**AFFIDAVIT**

I, Michael Palinkas, currently assigned to the Cleveland Division of the FBI as a Task Force Officer, being duly sworn, do state the following:

**INTRODUCTION**

1.      As a Task Force Officer for the FBI, I am an investigative law enforcement officer of the United States of America within the meaning of Title 21 Matters. I am empowered to conduct investigations and to make arrests for drug related and money laundering offenses.

2.      I have been employed by the City of Ashtabula Police Department for nearly nine years, including eight years in the Detective Bureau. During this time, I have served as an investigator with the Trumbull Ashtabula Group (TAG) and then CEAAC which investigated activities of drug trafficking organizations and violent crimes.  I currently serve as the commander of the Ashtabula Police Department Narcotic Investigative Unit (APDNIU).  The APDNIU, which operates in conjunction with the FBI Safe Streets Task Force, conducts investigations into the activities of drug trafficking organizations, gang related violent crimes, along with other violent crimes which include felonious assaults and homicide. As a Task Force Officer of the FBI and a local investigator, I have participated in narcotics/drug enforcement and the dismantlement of mid to upper-level drug trafficking organizations.  I have participated in the planning and execution of long-term investigative operations that have led to the disruption and dismantlement of criminal organizations whose revenues centered primarily on the trafficking and distribution of illicit drugs.

3.      I received my OPOTA certificate at the Lakeland Community College and in addition to that has been to numerous narcotic schools throughout his law enforcement career. I have training in the recognition, production, and distribution of controlled substances, and also

received advanced training in overall narcotics investigations. I have received field training and accrued practical experience in advanced drug-related investigative techniques that include, but are not limited to, surveillance, interview and interrogation techniques, informant recruitment and control, search warrant and case preparation, and interception and analysis of recorded conversations. I have been involved in controlled undercover purchases of drug evidence and subsequent arrests of defendants charged with drug-related crimes. I have supervised the activities of informants who have provided information concerning controlled substances and organized criminal activities, purchased controlled substances, and supervised consensual monitoring in connection with these investigations. I have utilized various forms of tracking technology to assist in various forms of criminal investigation.

4. I make this affidavit in support of a criminal complaint and arrest warrant for MITCHELL CAMPBELL for violations of: Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) (Possession with Intent to Distribute Controlled Substances).

## BASIS OF INFORMATION

5. I am familiar with the facts and circumstances of the offenses described in this Affidavit based upon my personal participation in the investigation of MITCHELL CAMPBELL as well as through information obtained from other law enforcement agencies, witnesses, and reliable sources.

6. Except as otherwise noted, the information set forth in this Affidavit has been provided to me by FBI Agents or other law enforcement officers. Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report your I have read and reviewed. Likewise,

2

information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my observations but rather has been provided directly or indirectly by FBI Agents or other law enforcement officers who conducted such surveillance. Likewise, any information pertaining to vehicles and/or registrations, personal data on subjects and record checks has been obtained through the Law Enforcement Automated Data System (LEADS); from Thompson Reuters, a law enforcement credit header database (CLEAR); from the State of Ohio or the National Crime Information Center (NCIC) computers; or by the Ohio Law Enforcement Gateway database (OHLEG) by members herein described.

7.      Since this Affidavit is being submitted for the limited purpose of securing the requested arrest warrant and complaint, this affidavit does not contain each and every piece of information known to me and other investigators, but rather only information sufficient to establish probable cause to support the requested arrest warrant and complaint.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

8.      On April 3rd, 2026, in conjunction with an ongoing federal investigation into MITCHELL CAMBPELL, a federal search warrant was issued by US Magistrate Judge Jennifer Armstrong for **314 W. Main St, Andover, OH**, which is in the Northern District of Ohio, Eastern Division. Throughout the course of our investigation, it had been determined that **314 W. Main St, Andover**, was CAMPBELL'S primary residence, which he used for the distribution of methamphetamine.

9.      On April 6th, 2026, members of the FBI Safe Street Task Force (FBI SSTF), DEA Task Force, Ashtabula Police Department and the Andover Police Department conducted a briefing at the Andover Police Department in preparation for the execution of the search warrant.

3

10.     At the conclusion of the briefing, investigators proceeded to **314 W. Main St, Andover**. Upon our arrival, Chief Baker (Andover PD) conducted announcements over his PA system as the other investigators set up the perimeter and started our approach to the rear porch.

11.     After several minutes, and without receiving any response from the occupants, investigators approached the rear entry door and started to knock and again announcing our presence. When no response was received, the rear door was breached utilizing a ram. As the door swung open voices could be heard within the residence and announcements were again given.

12.     A few moments later MITCHELL CAMPBELL, along with his daughter, later identified as Natalie Campbell, entered the kitchen from the area of the living room. Both were escorted out of the residence and CAMPBELL was detained. At the same time, the perimeter units at the front of the residence announced that a female, later identified as Christina Zerucha, had just exited the front door and had been detained. It was later determined that Zerucha is the live-in girlfriend of CAMPBELL.

13.     Investigators then continued with the initial sweep of the residence at which time nobody else was located. As a secondary sweep was being conducted, I met with CAMPBELL who was seated on the rear porch. I advised CAMPBELL of the search warrant and proceeded to advise him of his rights under Miranda. CAMPBELL confirmed that he understood his rights. (Witnessed by Det. Emch).

14.     CAMPBELL proceeded to deny any involvement with drugs and indicated that he didn't know why we were present. I asked him specifically if we would locate any drugs within the residence and he stated, "we shouldn't." I advised him that this was not a very definitive answer and he continued to maintain his innocence. I further told him that he had obviously been

4

the target of a federal investigation that resulted in the issuance of a search warrant. CAMPBELL continued to deny any wrongdoing.

15.     I then proceeded around the front and met with Zerucha who was seated in Chief Baker's cruiser. I explained to her what was going on and asked her what was transpiring within the residence when we arrived. Zerucha stated that she had been sleeping in the second-floor bedroom, and she believed that CAMPBELL had initially been downstairs. She stated that CAMPBELL came into the bedroom and told her that the police were present. Zerucha stated that they then descended the steps together. She was further asked if CAMPBELL had done anything while in her presence this morning, specifically if he had hidden or destroyed anything within the residence. She stated that she was only with him briefly as they descended the steps and could not say what he had done before waking her up. I learned from Zerucha that she had been living with CAMPBELL for several months, but they were having relationship issues. She stated that most of her personal property was inside her rental car, which was parked at the back of the residence. Zeurcha denied knowing CAMPBELL'S business nor did she know if or where he kept any drugs.

16.     Investigators then proceeded with the search of the residence. During this time, we located and seized a cell phone which Zerucha had in her possession when we arrived. As the search continued, we were unable to locate CAMPBELL'S cell phone, nor did we find any digital scales. I approached CAMPBELL and asked him where his cellphone was located. CAMPBELL indicated he did not have a cell phone. I also advised CAMPBELL that I believed he had likely concealed his cell phone, digital scales, and any drugs, which he had in his possession when investigators arrived on scene. CAMPBELL continued to deny this.

17.     At one point Zerucha was escorted into the residence so that she could change and collect her medication so that she could depart. I then escorted Zerucha to the second-floor master bedroom at which time she identified her purse and another bag. I conducted a search of both bags at which time no contraband was located. During this time, I observed another purse-style bag along the same side of the bed and near where the other items of Zerucha's were located. I asked Zerucha if the bag did indeed belong to her at which time she confirmed it did. I then proceeded with a search of that bag at which time I located two smaller clear bags, which appeared to contain methamphetamine. As I located the bags Zerucha admitted that they belonged to her but had reportedly picked them up downstairs and put them into the bag, implying that they belonged to CAMPBELL.

18.     Zerucha also agreed to provide consent and the PIN for me to conduct a brief review of her cell phone while on scene. The cell phone, which contained phone number 440-858-3625, was accessed. During my initial review of some of the messages, I found that Zerucha did appear to be involved in the distribution of drugs. When confronted with the messages, Zerucha stated that she had been selling marijuana and denied any involvement in CAMPBELL'S business. She was advised that we would be maintaining custody of her cell phone.  At the conclusion of our interactions, Zerucha departed in her vehicle (also searched).

19.     As the search of the residence continued, we were unable to locate any of the drugs. S.A. Sullivan and I again met with CAMPBELL and requested his assistance identifying where he may have hid his cellphone and other contraband. CAMPBELL continued to deny anything was present. He eventually admitted that he had "slipped" up months ago and started to use again. CAMPBELL stated that he was just trying to take care of his two children who he had

6

custody of and resided here with him. CAMPBELL was then asked if he had any contraband at his mother's residence on Russell Rd. CAMPBELL stated that he did not.

20. S.A. Rock, S.A. Sullivan and I then departed the target address and proceeded to 5014 Russell Rd, Andover. This is the primary residence of Juanita Klemencic, who is CAMPBELL'S mother. Upon arrival, we observed that Zerucha's vehicle was at the residence. We then made contact with Klemencic who allowed us to enter the residence. Klemencic indicated that she was obviously aware of the police activity at her son's residence and denied having any knowledge that he was again involved in drugs. She was asked if CAMPBELL had been over recently and stated he was over yesterday for Easter. Klemencic denied that he had brought anything over and was only there for dinner. She did give us verbal consent to search the residence. We did conduct a brief search and did not observe any contraband. During this time, we did learn that Zerucha had come there with CAMPBELL'S daughter but had since departed with another family member to pick up some clothes.

21. We then departed and started back towards the target address. During this time, I made contact with Confidential Source CS 1002, hereinafter referred to as the CS. The CS confirmed the reports that CAMPBELL had been keeping his drugs at his mother's residence. The CS further stated that Zerucha was rumored to be trying to recruit somebody to "rob" CAMPBELL of his drugs, which were reportedly concealed in a tree. The CS indicated that he/she took this to mean he had his drugs stashed outside in a tree at his mother's residence.

22. Upon arriving back at the target location, I consulted with S.A. Sullivan about the above information. The decision was made to return to Klemencic's with a K-9 to assist with a search of the yard and curtilage. S.A. Sullivan remained at the target location and continued with their search while I returned to 5014 Russell Rd.

7

23. When investigators returned to 5014 Russell Rd we found that Zerucha had returned a short time ago. I then spoke outside with Zerucha. She was asked about the information she had been recruiting an individual, or individuals, to steal, or rob, CAMPEBLL of his methamphetamine, and the fact the methamphetamine was reportedly "stashed" in a tree on his mother's property. Zerucha admitted that she had spoken with individuals in reference to the "robbery', but indicated this was "years ago" when they first started dating in 2022. During this time Zerucha admitted to knowing of CAMPBELL'S business and that she had been referring customers to him. She also confirmed that CAMPBELL had been in possession of his cell phone last night when they returned home and she did not believe he had gone anywhere this morning before the police arrived. She added that she could usually hear his truck when he leaves. CAMPBELL also indicated that she was with him all day yesterday and their only stops were the car wash, the store and his mother's house. Zerucha also stated that when CAMPBELL had "visitors" he would usually go to the basement or stay out in the garage.

24. As I was speaking with Zerucha, Klemencic opened the door and stated that she did not want us to conduct another search of her property without a search warrant. All investigators then cleared and returned to the target location.

25. We continued to search the residence, with an emphasis on the curtilage. As this search was being conducted, Det. Emch located what appeared to be a quantity of methamphetamine concealed within a hollowed out portion of a tree. The tree, which contained a "hollow" near the ground, was located to the east of the residence and next to the driveway. It was approximately 10-12 feet from CAMPBELL'S red Ford truck. The area was photographed, and the item was removed. The suspected methamphetamine was contained in a large clear zip-

8

loc style bag, which had been inside a black nylon zipper case. During the recovery of the item, it was preserved for DNA.

26. I then approached the patrol vehicle which contained CAMPBELL. He confirmed that the tree was clearly within his yard but was non-committal when asked if the methamphetamine belonged to him by shrugging his shoulders.

27. Several surveillance cameras were visible on the exterior of the residence and the detached garage. One of the cameras was pointed directly at the area of the driveway and the tree. The hollowed area was located on the side of the tree which faced the residence and the camera. Photos were obtained of the cameras.

28. We then continued with a search of the residence, detached garage, and all curtilage for the cell phone and all other potential contraband. During our investigation we knew that CAMPBELL was in possession of at least one digital scale. We were unable to locate the cell phone or any other contraband.

29. CAMPBELL was then transported to the Ashtabula City Jail and secured on a federal hold until a criminal complaint could be filed on 4/7/2026. All evidence was transported to the office.

30. I then processed into evidence the bulk quantity of methamphetamine that had been located in the tree. Utilizing buccal swabs, I processed the zip-loc bag for DNA. Two separate areas were processed, the first the top zip-loc seal and the second the main portion of the bag. I also processed the zipper on the black nylon bag which contained the zip-loc bag. Three separate DNA swabs were obtained.

31. The methamphetamine was then weighed and found to be approximately 277 grams. It also field "NIK" tested positive for methamphetamine. Photos were obtained of the

9

approximate weight and the positive test. Based on my training and experience and my knowledge of this investigation, this amount of methamphetamine is consistent with drug trafficking.

32.     I also conducted a custodial interview of CAMPBELL. CAMPBELL confirmed he had previously been advised of his rights under Miranda, and that it still applied. During the interview, CAMPBELL indicated that he had relapsed and had sold some "bags" to individuals. CAMPBELL was reluctant to identify his source of supply nor would he discuss in depth his drug trafficking.  CAMPBELL also did not deny the methamphetamine located in the tree belonged to him, but he also would not admit to it. I also discussed with him the fact that one of his exterior surveillance cameras was pointed directly at the driveway and the tree. CAMPBELL stated that the camera had been pointed there for years.

33.     Other items seized during the execution of the search warrant was $1,335 in US Currency which was inside CAMPBELL'S wallet. The wallet was on CAMPBELL when he was initially detained. Also located were several clear plastic zip-loc bags which were located inside a kitchen drawer. The bags are consistent with the packaging used in the controlled buys during the investigation into CAMPBELL.

## CONCLUSION

34.     Based on the foregoing, I believe that there is probable cause to believe that

MITCHELL CAMPBELL committed the violations of Title 21, United States Code, Sections

841(a)(1) and (b)(1)(C).


_____
Task Force Officer Michael Palinkas
Cleveland FBI SSTF


This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email, per Crim. R. 41(d)(3) on this ____ day of April 2026. *at 10:10 a.m.*



_____
JENNIFER DOWDELL ARMSTRONG
UNITED STATES MAGISTRATE JUDGE

11